IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| SHARON A. LAVELLE, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 06-0051-CV-W-ODS |
| JO ANNE B. BARNHART, Commissioner of Social Security | ) |
| Defendant. | ) |

**ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her application for disability benefits. The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in September 1955, has completed high school and has attended a few college classes. She last worked full time in June 2001; she worked in the photography studio in a department store and, later, as a floor supervisor. After her full time job ended, Plaintiff began doing piece work for a craft store. This involved painting wood pieces; she did this work for approximately one year. R. at 349-52. Prior to her work at the department store, Plaintiff worked part time as a waitress, office clerk, bank teller, and a crossing guard. Plaintiff filed her application for benefits in May 2003, alleging an onset date of August 2002.

In approximately January 2001, Plaintiff began experiencing episodic fevers of unknown origin. She was referred to Jennifer Rubin, a specialist in infectious diseases, but the Record does not contain any reports from her. The Record does reveal Plaintiff had normal blood work, a normal spinal tap, and that tests for Lupus were negative. The fevers apparently stopped in March 2001, and subsequent medical records demonstrate

either (1) normal temperatures or (2) temperatures related to specific, temporary maladies (e.g., infections). R. at 112-17.

In March 2003, Plaintiff saw Dr. Raymond Rizzi, an orthopedist, with complaints of increasing chronic foot pain. He diagnosed her as suffering from plantar fasciitis and a possible stress fracture. R. at 156-57. On March 24, 2003, Dr. Rizzi noted that x-rays revealed no stress fracture and that Plaintiff reported taping her foot helped. He prescribed exercises, measured her for orthotic devices, and administered an injection. R. at 155. One week later, Plaintiff had her foot retaped, but no injection was administered because she was doing well. R. at 154. On April 24, Plaintiff received another injection and received her orthotics. R. at 153. Plaintiff last saw Dr. Rizzi on June 3, 2003, at which time adjustments were being made to her orthotics and Plaintiff reported the treatment was "help[ing] signficantly." R. at 151.

On July 3, 2003, Plaintiff went to the Rheumatology Clinic at the University of Kansas Medical Center complaining of "transient episodes of fever" and generalized fatigue and pain. She was assessed as suffering from a connective tissue disease, but additional tests were required to confirm and identify her affliction. Plaintiff symptoms were also deemed "suggestive of fibromyalgia," for which she was given Flexeril to help her sleep and instructed to take ibuprofen for pain. R. at 235. The Record does not indicate that Plaintiff returned for the testing that was suggested.

On September 23, 2003, Plaintiff underwent a consultative examination conducted by Dr. Mary Brothers. The stated purpose of the exam was to assess Plaintiff's back pain, which she attributed to lifting a sack of quarters when she worked as a teller. Plaintiff also told Dr. Brothers she had Lupus, fibromyalgia, asthma, and plantar fasciitis, and complained of pain in the thumbs as well as her back. Dr. Brothers testing and examination, led her to opine that Plaintiff had "[p]robable fibromyalgia," although she did not demonstrate many of the trigger points associated with the condition. There were no record confirming a diagnosis of Lupus. Plaintiff suffered from asthma and hypertension, both of which were controlled with medication. Plaintiff did suffer from plantar fasciitis and a probable bulging disc without nerve impingement. With respect to Plaintiff's hands, Dr. Brothers noted a history of carpal tunnel syndrome that had been

treated with nerve release surgery. Dr. Brothers opined Plaintiff could sit for one hour at a time and six hours a day and walk thirty to sixty minutes at a time and four or five hours a day. She stressed the need for Plaintiff to be able to change posture/position and sit/stand at her option. She further indicated Plaintiff needed to avoid high-speed repetitive tasks, lifting heavy objects, and repetitive squatting, crouching and stair climbing.

She saw a neurologist (Dr. Parveen Kumar) on February 10, 2004, complaining of pain and itching/tingling in her right elbow and wrist. Dr. Kumar believed these symptoms were likely related to non-neurological conditions but suggested a series of tests be performed. R. at 227-28. Approximately one week later, a nerve conduction study demonstrated the nerve release surgery adequately addressed her carpal tunnel syndrome and the test results were unremarkable. R. at 258. (This confirmed the results of an earlier test performed in August 2003. R. at 263). In early March 2004, Plaintiff complained of pain in her neck and shoulder; an EMG was normal, and an MRI revealed degenerative disc disease with moderate to severe narrowing at C5-6 and some narrowing at C6-7. Epidural injections were recommended and administered. R. at 240-41.

On March 15, Plaintiff saw another neurologist, Dr. Jonathan Chilton, on Dr. Kumar's referral. Dr. Chilton found nothing to explain why Plaintiff would be suffering numbness and tingling in her arms and writs, and specifically indicated Plaintiff's disc disease would not cause the symptoms she complained of. R. at 230-31. Approximately two weeks later, Plaintiff returned to KU Medical Center, where she was described as suffering from fibromyalgia, back pain, sleeping disorder, and an "ill-defined connective tissue disease." The doctor provided Relafen to be used instead of ibuprofen, adjusted the dosages of other medications she had been given, and told Plaintiff to return in three to four months. R. at 310-12. Plaintiff returned in October, at which time the assessment was "fibromyalgia – moderately active," pain in the hands, back and neck, bursitis and sleep disorder. Her medication dosages were modified and Plaintiff was given a referral to the neurology/headache clinic. R. at 313-15. She returned to KU Medical Center in February 2005, complaining of difficulty sleeping, pain and stiffness,

and fatigue – but the record of that visit does not clearly reflect what if anything was done for her at that time. R. at 30204. One month later, an MRI revealed a disc protrusion at L4-5 that was "approaching the left L4 nerve root," a small protrusion above L1, and mild degeneration in the lower lumbar region. R. at 294-95.

During the hearing, Plaintiff testified she can stand for about thirty minutes before her foot hurts and begins to swell, requiring that she sit down – but she can only sit for an hour before pain in her back and legs requires that she stand up. R. at 353-54. She suffers from weakness in her legs and hands, and her hands suffer from shaking, numbness and tingling and she drops things she is holding. R. at 356, 360-61. Plaintiff's daily and household activities consist of watching the news, reading the newspaper, dusting, laundry, making beds, sewing, and tending to flowers on her deck. R. at 88, 357-58. The orthotic devices prescribed to address her plantar fasciitis relieve the pain, but she believes they contribute to the swelling in her legs (as does standing for too long), and she has been prescribed water pills to address this problem. R. at 359, 365. She reported experiencing episodes of high fevers that can last for months. R. at 361, 366. She also reported constant back pain that radiates into her hips and down her right leg, for which she was prescribed an anti-inflammatory and hydrocodone. However, the only thing Plaintiff can do to eliminate the back pain is lie flat, which she does a couple times a day for fifteen to twenty minutes at a time. R. at 363-64. Finally, Plaintiff reports the fibromyalgia was diagnosed in 2000 or 2001 and causes her joint pain and "general ill feelings" on a regular basis. R. at 367-68.

The ALJ elicited testimony from Dr. Hershel Goren, a neurologist. He reviewed Plaintiff's medical records but did not examine her. He testified that the only severe impairments documented in Plaintiff's records were the disk problems in her back and asthma (which is controlled by medication). He confirmed the records demonstrated Plaintiff suffered from basal ganglia lacunar infarct – or, a very minor stroke – but explained this is quite common in people over age fifty and there is no severity associated with the event because there was no evidence of ongoing symptoms. R. at 337-38, 344. Testing for connective tissue diseases or disorders including Lupus) was negative and failed to demonstrate a medical basis for Plaintiff's claims of numbness and

4

tingling. R. at 340-42, 344-45. He deemed the problems with Plaintiff's spine as not serious because the MRIs demonstrated the disk protrusions were approaching, but were not contacting or impinging upon, the nerve. R. at 345-47.

The ALJ found Plaintiff's testimony overstated the severity of her condition and the extent of her limitations. This finding was supported by observations that: (1) medical records and testing did not establish a medical basis for the severity of pain she described, (2) medical records did not include complaints from her of the nature and degree she described in her testimony, (3) some of her conditions are controlled or ameliorated with treatment, (4) Plaintiff's daily activities were inconsistent with some of her claims, and (5) Plaintiff's work history suggested she was not strongly motivated to work. The ALJ found Plaintiff retained the capacity to stand or walk six hours per day, sit six to eight hours a day but needed the freedom to stand up every hour, lift twenty pounds occasionally and ten pounds frequently, and avoid fumes, heights, ladders, ropes, scaffolds. Based on the answers to hypothetical questions posed to a vocational expert, the ALJ found Plaintiff could return to her past work as a photographer and could also perform other work in the national economy (including various clerical jobs).

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might

accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Plaintiff first contends the ALJ erred in discounting her credibility. The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
>     1. The claimant's daily activities;
>     2. the duration, frequency and intensity of the pain
>     3. precipitating and aggravating factors;
>     4. dosage, effectiveness and side effects of medication;
>     5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

With respect to Plaintiff's complaints of pain, the critical issue is not whether Plaintiff experiences pain but rather the degree of pain that she experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The Court accepts Plaintiff's argument that her

subjective complaints of pain cannot be discounted or ignored simply because they are not fully corroborated by objective medical evidence, but Polaski indicates this is a factor that may be considered.  Plaintiff's testimony is also contradicted by other evidence in the Record.  She testified she experiences numbness and tingling in her hands, but in addition to the lack of any medical basis for this condition Plaintiff performs tasks requiring fine motor movement (painting wooden pieces for a craft store, tending to plants and flowers, sewing).  Her testimony about constant fevers is undercut not only by her lack of complaints after 2001, but also the medical reports from her visits indicating her temperature (which is taken as a routine part of any doctor visit) was in a normal range.  While Plaintiff suffers from plantar fasciitis, the condition is controlled with the use of orthotic devices.  Similarly, Plaintiff's asthma and swollen legs are controlled with medication and her carpal tunnel syndrome was successfully addressed with surgery.  Plaintiff's claim of a need to lie down regularly on a daily basis was undercut by both the failure of any doctor to suggest this course and her own failure to report this need to her doctors.  Plaintiff also did not report side effects of medication to her doctors, so the ALJ was justified in discounting her testimony on this matter.  Finally, Plaintiff's lack of a significant work history was a permissible ground for the ALJ to consider.  E.g., Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).

      Plaintiff also emphasizes the findings of the doctors at KU Medical Center that she suffered from fibromyalgia.  There is some question as to where this diagnosis originated, given that the initial diagnosis was only "suggestive" of fibromyalgia, and later reports accept this as a formal diagnosis without explanation or testing.  More importantly, a person with fibromyalgia is not automatically disabled: therefore, even if one accepts Plaintiff suffers from fibromyalgia (or something like it), the diagnosis alone does not entitle her to benefits.  Reports from KU Medical Center (which she describes as her treating physician) do not provide any insight into Plaintiff's functional capacity.

      The ALJ's factual findings are supported by substantial evidence in the record as a whole, and her hypothetical questions to the Vocational Expert incorporated those findings.  Therefore, the ALJ's ultimate conclusion that Plaintiff can return to her past

Case 4:06-cv-00051-ODS   Document 12   Filed 08/03/06   Page 7 of 8

work as a photographer and perform other work in the national economy is also supported by the Record.

### III. CONCLUSION

The Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

                                      /s/ Ortrie D. Smith
                                      ORTRIE D. SMITH, JUDGE
DATE: August 3, 2006                 UNITED STATES DISTRICT COURT